COMMONWEALTH of Pennsylvania,
Appellant

v.

Terrance WILLIAMS, Appellee

Commonwealth of Pennsylvania,
Appellant

v.

Terrance L. Williams, Appellee

No. 668 CAP, No. 669 CAP

Supreme Court of Pennsylvania.

SUBMITTED: August 25, 2016

August 22, 2017

Shawn Nolan, Esq., Defender Association of Philadelphia, for Appellee.

Peter Carr, Esq., Philadelphia District Attorney's Office, Hugh J. Burns, Esq., Amy Zapp, Esq., Office of Attorney General, for Appellant.

## ORDER

PER CURIAM

AND NOW, this 22nd day of August, 2017, the Court being equally divided, the September 28, 2012 order of the PCRA court granting a stay of execution and ordering a new penalty phase trial is hereby AFFIRMED. The matter is remanded to the Court of Common Pleas of Philadelphia County for a new penalty phase trial.

Justice Donohue files an opinion in support of affirmance in which Justice Wecht joins.

Justice Mundy files an opinion in support of reversal in which Justice Dougherty joins.

Chief Justice Saylor and Justices Baer and Todd did not participate in the consideration or decision of this matter.

## OPINION IN SUPPORT OF AFFIRMANCE

JUSTICE DONOHUE

The Commonwealth appeals from the order of the Court of Common Pleas of Philadelphia County granting the petition for relief filed by Appellee, Terrence Williams ("Williams") pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–46 ("PCRA"). Because the certified record in this case amply supports the lower court's findings that the Commonwealth willfully suppressed material exculpatory evidence, and that this suppression of evidence prejudiced Williams during the penalty phase of his trial, we affirm the PCRA court's determination that Williams' PCRA petition successfully asserted a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We further affirm the PCRA court's decision to award Williams a new penalty phase trial.

In connection with a prior appeal, this Court offered the following brief summary of the facts underlying Williams' convictions of first degree murder, robbery and criminal conspiracy:

On June 11, 1984, [Williams] and Marc Draper lost their money gambling on a street corner. [Williams] left to get money from the victim, Amos Norwood, and returned with $10. Later, Norwood drove up to the two. [Williams] told Draper they were going to take some money from Norwood, and the three men left in Norwood's car. [Williams] directed Norwood to a secluded area

where he and Draper forced Norwood out of the car, bound and gagged him, and then took money and other items from him. [Williams], with a tire iron, and Draper, with a wrench, beat Norwood to death and fled. Later that night, [Williams] returned and burned the body.

*Commonwealth v. Williams,* 581 Pa. 57, 863 A.2d 505, 509 (2004).

At trial in 1986, the Commonwealth offered the testimony of Mamie Norwood, the decedent's wife, and Reverend Charles Poindexter, the decedent's pastor, both of whom reviewed for the jury Amos Norwood's work with the youth in the church. N.T., 1/14/1986, at 60, 157–58, 140–41, 166–68, 172–74.[1] Based in part on this testimony, in her closing argument in the penalty phase, the prosecutor, Andrea Foulkes, argued to the jury that Norwood was a "kind" and "innocent" man who had done nothing more than offer Williams a ride home, and that Williams had brutally killed him just get a small amount of money and two credit cards. N.T., 2/3/1986, at 1873–76. At the time Prosecutor Foulkes made this argument, she knew that the Commonwealth's files contained multiple documents, some in her own handwriting, demonstrating that Amos Norwood was neither kind nor innocent, and that he was in fact a sexual abuser of young adolescents, perhaps including Williams. Without this information, which was not provided to defense counsel as required by *Brady,* the jury returned a death sentence.

This Court affirmed the judgment of sentence. *Commonwealth v Williams,* 524 Pa. 218, 570 A.2d 75 (1990). On March 9, 2012, Williams filed his fourth PCRA petition, in which he alleged, based in part upon affidavits signed by Marc Draper,

that, inter. alia, (1) his trial counsel was ineffective for not introducing mitigating evidence at the penalty phase of his trial, and (2) the Commonwealth had suppressed evidence of statements made to Draper at the time of trial and promises made to him to induce his cooperation during trial. Judge Teresa Sarmina of the Court of Common Pleas of Philadelphia County ordered the Commonwealth to produce various discovery materials, including police homicide files for Williams' two murder convictions (Norwood and Herbert Hamilton) and all reports or notes relating to Draper or Norwood's sexual relationships with Williams or other children under the age of eighteen. On September 28, 2012, Judge Sarmina granted Williams' PCRA petition, vacated his death sentence and granted him a new penalty phase trial. This Court, by opinion dated December 15, 2014, vacated Judge Sarmina's order, dismissed the PCRA petition, and reinstated the death penalty. *Commonwealth v. Williams,* 629 Pa. 533, 105 A.3d 1234 (2014). The United States Supreme Court, by opinion dated June 9, 2016, vacated our decision and remanded it back to this Court for further proceedings. *Williams v. Pennsylvania,* —— U.S. ——, 136 S.Ct. 1899, 195 L.Ed.2d 132 (2016).

In her written opinion, Judge Sarmina issued a lengthy opinion that included numerous findings of fact, with credibility determinations based upon her observation of the two witnesses appearing at a September 2012 evidentiary hearing—Prosecutor Foulkes and witness Marc Draper. As this Court has repeatedly held, the findings of a PCRA court are entitled to "great deference":

---

1. Both Mamie Norwood and Reverend Poindexter testified during the guilt phase of the trial. The trial court allowed evidence from

this phase to be considered in the penalty phase, which followed immediately thereafter.

The findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given great deference. We will not disturb the findings of the PCRA court if they are supported by the record, even where the record could support a contrary holding. *Commonwealth v. Sullivan,* 472 Pa. 129, 371 A.2d 468, 476 (Pa. 1977). This Court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. *See, e.g., Commonwealth v. Meadius,* 582 Pa. 174, 870 A.2d 802, 805 (Pa. 2005).

*Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 293 (2006).

Based upon her exhaustive review of the evidence in the record, Judge Sarmina concluded that:

> [T]he Commonwealth suppressed multiple pieces of evidence, all of which shared a common feature: each strengthened the inference that Amos Norwood was sexually involved with boys around [Williams'] age at the time of his murder. The Commonwealth withheld one such statement entirely and turned over to the defense two "sanitized" statements.... [T]he government interfered with [Williams'] ability to present the claim that his due process right to a fair trial had been violated. This claim has not been waived, nor previously litigated, as it is based on information discovered in September 2012. The suppression of this evidence, which could have been used to develop and pursue an alternate theory at the penalty phase, undermines confidence in the jury's death sentence, thereby constituting a meritorious claim of a consti-

tutional violation under *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963) and *Cone v. Bell,* 556 U.S. 449 [129 S.Ct. 1769, 173 L.Ed.2d 701] (2009).

PCRA Court Opinion, 11/27/2012, at 12–13 (footnotes omitted).

Judge Sarmina determined that the Commonwealth's decision to "sanitize" the witness statements of both Mamie Norwood and Reverend Poindexter interfered with Williams' ability to state a *Brady* claim until 2012:

> By scrubbing these statements of references to Mr. Norwood's sexual improprieties and then providing "clean" versions [to the defense and courts], the government created the false impression that [Williams] was given the full account of what these witnesses stated. That false impression hobbled [Williams'] ability to discover or develop a *Brady* claim rooted in information removed from the scrubbed statements. That false impression was maintained by the Commonwealth until the original statements were found [in September 2012] in the government's files and some in the very handwriting of the trial prosecutor ...., [T]hroughout the litigation of this case, the government has disputed the existence of information in their files about Amos Norwood's homosexual ephebophilia,[2] thus further interfering with [Williams] learning the facts that form the basis of the instant *Brady* claim.

*Id.* at 15.

Judge Sarmina concluded that Prosecutor Foulkes' actions were intentional and specifically designed to secure the death

2. The PCRA court defined "homosexual ephebophilia" as the psychological term describing the sexual attraction of adults to adoles-

cents. PCRA Court Opinion, 11/27/2012, at 13 n.32 (citing Webster's New Encyclopedic Dictionary 610 (2002)).

penalty she had failed to obtain in a prior death penalty case against Williams:

> In the Herbert Hamilton case ... Ms. Foulkes aggressively sought a first degree murder conviction and imposition of the death penalty .... [T]he third degree verdict in the Hamilton case colored Ms. Foulkes' decisions when she prosecuted appellee for the murder of Amos Norwood. First, Ms. Foulkes identified what she believed to be the reason that the jury returned a "compromised" [third degree] verdict. And then she attempted to eliminate evidence which caused the "compromised" verdict from being presented to the [Norwood] jury. ... The "sexual overtones and relationships," which she credited with leading the [Hamilton] jury to reach a compromise verdict, revolved around the fact that a middle-aged man may have been paying [Williams], still in his teens, for sex.

> \* \* \*

> Ms. Foulkes admitted to this [c]ourt that her knowledge of [Williams'] sexual past created an obvious implication that his relationship with Amos Norwood was substantially similar to his relationship with Herbert Hamilton .... But Ms. Foulkes made certain that the jury did not see that sexual connection. When confronted about the existence of evidence supporting her own suspicion that Mr. Norwood had been sexually inappropriate with [Williams] at the PCRA hearing before this [c]ourt, Ms. Foulkes grossly misrepresented the evidence in the government's files.

PCRA Court Opinion, 11/27/2012, Appendix at 2–5.

Judge Sarmina found, as a matter of fact, that Prosecutor Foukles' actions created an important difference in the Hamilton and Norwood trials that contributed to the death sentence in the latter case:

> The major difference between the Hamilton and Norwood cases is that evidence of a sexual relationship between the middle-aged victim and [Williams] was presented to the jury in the first, but not in the second. The [c]ourt is quite mindful that Ms. Foulkes had no duty to do the defense's job for them, and she had the right to present a different theory of the case that focused on a robbery of the victim and not on a relationship that existed or might have existed between the victim and appellee. However, she did have a duty to provide the defense with that evidence, because it was exculpatory and "material." The fact that a portion of Ms. Foulkes' penalty phase closing argument—the culmination of prosecuting [Williams] for both the Hamilton and Norwood murders—focused on an aspect of the evidence that could have been rebutted by the withheld information more than suggests that Ms. Foulkes was aware of the significance of what was brushed under the rug. This [c]ourt concluded that intentionally rooting that evidence out of the Norwood case in order to secure a death penalty sentence amounted to "gamesmanship."

*Id.* at 7–8.

The Commonwealth's efforts to hide evidence of Amos Norwood's homosexual ephebophilia did not end with the 1986 trial. In a 1998 PCRA petition, Williams asserted a claim of ineffective assistance of counsel based upon the failure of trial counsel to introduce evidence of his sexual abuse as a child. Two witnesses, Donald Fisher and James Villarreal, attempted to offer testimony that Norwood had a reputation for sexually molesting young boys. N.T., 4/13/1998, at 602; N.T., 4/8/1998, at 225–32. The PCRA court interrupted and specifically asked counsel for the Commonwealth if there was any evidence regarding

Norwood's molestation of young boys. N.T., 4/8/1998, at 237. Again, despite significant evidence in the Commonwealth's own files to the contrary, counsel for the Commonwealth advised the PCRA court that, other than Draper's trial testimony regarding the suggestion that he and Williams could extort money from Norwood, no such evidence existed.[3] *Id.* As a result of this false representation by counsel for the Commonwealth, the PCRA court indicated that it would not consider the testimony of Fisher or Villarreal because it lacked any corroborating detail. N.T., 4/13/1998, at 602 ("I will not consider it as a fact unless ... [t]here would have

3. The contention of the Opinion in Support of Reversal ("OISR") that the Commonwealth did not misrepresent the trial record, *see* OISR at 121 n.14, is contrary to both the certified record on appeal and Judge Sarmina's findings of fact. The exchange between the PCRA court and counsel for the Commonwealth was as follows:

   [The Commonwealth]: Well, Your Honor, I was only going to remind the [c]ourt that, in fact, there was evidence that this defendant knew some sort of dark secret about Mr. Norwood, because this case began as an extortion. He suggested to this co-defendant they knew—that he knew something about Mr. Norwood which would enable them to extort money from Mr. Norwood and Mr. Norwood—

   The Court: But there is nothing in this case involving Norwood's homosexuality or violation of young boys—

   The Commonwealth: Well, that was the secret.

   The Court:—that accrued that was involved.

   The Commonwealth: Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it. It didn't work so it moved on to robbery and murder, so it was not a secret. It was not a secret to anyone at the time.

   The Court: You may proceed.

   N.T., 4/8/1998, at 237.

   It is clear from the certified record that the basis for the extortion plot, i.e., the "secret" that Draper and Williams knew about Norwood, was that he was gay. In his original statement/confession to police, Draper indicated that to get money, Williams was going to tell Norwood's wife that "Amos was gay." N.T., 9/25/2012, Exhibit P–2. Prosecutor Foulkes referenced this extortion plot to tell Norwood's wife he was gay in her opening statement at trial, N.T., 1/14/1986, at 41, and Draper so testified to the jury during his trial testimony. N.T., 1/22/1986, at 667–68.

   As the above exchange reflects, when the PCRA court asked counsel for the Commonwealth if there was any evidence about "Norwood's homosexuality or violation of young boys," counsel responded by referencing the "secret" and stating "Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it." As the record reviewed above demonstrates, the "secret" behind the extortion plot was merely that Norwood was gay, not that he was a homosexual ephebophile. Read in context, the only plausible understanding of counsel's answer was that he was misrepresenting to the PCRA court that **the only evidence responsive to the question** was that there was evidence of "Norwood's homosexuality," but there was no evidence of Norwood's "violation of young boys."

   Counsel for the Commonwealth, when directly confronted with the question of whether there was any evidence in the record regarding Norwood's "violation of young boys," misinformed the PCRA court that there was no such evidence (even though this evidence was in the Commonwealth's files at that time). Judge Sarmina found, as a matter of fact based upon the above-cited evidence of record, that this statement constituted an "affirmative misrepresentation" of the evidence. PCRA Court Opinion, 11/27/2012, at 16 n.34–35.

   As delineated above, supra at 3, our scope and standard of review precludes this Court from engaging in its own fact-finding efforts in contradiction to those of the PCRA court. Instead, this Court must show deference to a PCRA court's findings of fact, so long as they are supported by evidence of record, viewed in the light most favorable to the prevailing party (here, Williams), even where the record could also support a contrary holding. *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 293 (2006); *Commonwealth v. Meadius*, 582 Pa. 174, 870 A.2d 802, 805 (2005); *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468, 476 (1977).

to be evidence of it and, in other words, what was seen, when it was seen, who was present, who was involved. A statement by any witness of this nature doesn't have much credibility or impact ....". In its subsequent opinion denying Williams' PCRA claim, the PCRA court did not even mention Fisher's or Villarreal's testimony[4] and, clearly agreeing with the Commonwealth's attacks on the credibility of any evidence suggesting a sexual component to Norwood's murder, discounted Williams' mental health testimony. PCRA Court Opinion, 1/13/1999, at 14–15.

Judge Sarmina made the following findings of fact regarding the 1998 evidentiary hearing:

At the 1998 evidentiary hearing ... the government intervened as [Williams] attempted to put forth evidence that Amos Norwood had been sexually abusive towards young boys, including [Williams] ... [although p]recisely the evidence that [the PCRA court] asked for was sitting in the government's files. Without that evidence, the [PCRA court] forcefully attacked the relevance of testimony proffered by the defense as to any potential sexual impropriety in Norwood's past. Based on the Commonwealth's affirmative misrepresentation that there was nothing else in the case involving Norwood's "homosexuality or violation of young boys," [the PCRA court] prevented both lay witnesses and expert witnesses from developing that issue.

PCRA Court Opinion, 11/27/2012, at 16–17.

In subsequent appellate and federal habeas proceedings, the Commonwealth attacked the very suggestion that Norwood had ever molested anyone (including Williams), insisting that it was not supported by any evidence and constituted nothing more than desperate and incredible fabrications to overturn a death penalty. On direct appeal to this Court, the Commonwealth attacked the credibility of the lay and expert testimony, claiming that any suggestion of a sexual relationship between Williams and Norwood was merely "self-serving accounts ... made by the defendant, his family and friends," and that the "conclusions drawn by the defense experts were completely undermined by their unwavering trust in the[se] self-serving accounts." *Commonwealth v. Williams*, No. 247 CAP, Commonwealth's Brief at 25. This Court rejected Williams' appeal. *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505 (2004).

In the federal courts, the Commonwealth continued to attack any suggestion that Norwood had a history of sexual abuse of adolescences as "outrageous" and lacking in any supporting evidence. *Williams v. Beard*, No. 05–3486 (E.D. Pa. 2006) (Commonwealth's Response to Penalty–Phase Claims at 81). The district court agreed, concluding that Williams' evidence deserved no weight because it was based on nothing but Williams' own "self-serving information." *Id.* at 100.

The Commonwealth successfully employed the same strategy in the Third Circuit, which held that if Williams' trial counsel had presented mental health experts to testify that physical and sexual abuse by older men and family members during his adolescence had resulted in psychological damage at the time of Nor-

---

4. Without citation, the OISR represents that the PCRA court accepted the testimony of Fisher and Villarreal "as evidence of what was available to the defense in its preparation for trial." OISR at 122 n.15. Even if true (the PCRA court did not reference Fisher or Villar-

real in its opinion), this further highlights that the only "evidence" available to the defense was, at best, unsubstantiated hearsay—which could have been corroborated by and through the suppressed evidence in the Commonwealth's files.

wood's murder, this evidence would have been offset by conflicting evidence from Commonwealth experts that Williams was not suffering from any psychosis at the time of the murder. *See Williams v. Beard*, 637 F.3d 195, 233–35 (3d Cir. 2011). In ruling that Williams had not demonstrated prejudice, the Third Circuit indicated that the Commonwealth had "assail[ed]" allegations of sexual abuse as unsupported by any evidence and that, to the contrary, "all of the sexual abuse testimony is based upon statements provided in anticipation of the PCRA hearing." *Id.* at 229 n.26. The Third Circuit agreed, stating that "the Commonwealth's point is well taken and we will factor it into our prejudice analysis accordingly." *Id.*

At no time did the Commonwealth advise any of these courts (including this Court) that it had evidence in its files that would corroborate claims that Norwood suffered from homosexual ephebophilia. This information was not revealed until Marc Draper, who participated in Norwood's murder with Williams, agreed, for the first time in light of Williams' approaching execution date, to come forward to offer his knowledge of the relationship between Williams and Norwood and his interaction with Prosecutor Foulkes at trial. In an affidavit, Draper stated as follows:

8. I also told the prosecutor, Ms. Foulkes, that this case was about Mr. Norwood having sex with Terry. She was our prosecutor, me and Terry. She is the one who wrote the letter for me to the parole board. I sent this letter to Mr. Montroy at the end of August. I had prep sessions with Ms. Foulkes. I specifically remember meeting with her at her office. I remember the detectives taking me to her office, but other than Ms. Foulkes, I can't recall who else was present during the sessions. Neither Ms. Foulkes nor the police wanted to hear anything about the case having to do with Norwood having sex with Terry. They did not want me to talk about or testify about the things that I have talked about in this and my other declarations. In fact, I specifically remember [d]etectives telling me that information I gave them was not credible. They did not want me to say the case involved a relationship. They wanted me to say it was only a robbery. Ms. Foulkes made it clear with me that I had to stick to the story that this case was only about a robbery. I followed what they told me and stuck to it over the years. But it was obvious to me that Terry snapped at the time of the incident. I described this in my January declaration. I told Ms. Foulkes and the detectives about Terry "snapping" during the incident. I remember telling Ms. Foulkes about this the day that the [d]etectives picked me up at Holmesburg. It was odd because they walked me right down the street in Center City to the DA's office—through people and traffic. I told them about Terry snapping at the time Norwood was killed, and that his snapping was because of the relationship they had.

PCRA Court Opinion, 11/27/2012, Attachment B (Draper Affidavit, ¶ 8). At the evidentiary hearing in September 2012, Draper testified that Prosecutor Foulkes threatened to charge him with another (unsolved) murder, that of Donna Friedman, if he did not testify as instructed. N.T., 9/20/2012, at 177–78. In her subsequent written opinion, Judge Sarmina found Draper to be a credible witness. PCRA Court Opinion, 11/27/2012, at 5 n.14, 22–23.

At the September 2012 evidentiary hearings, the evidence showed that Reverend Poindexter had reported Norwood's sexual improprieties to the police. A police activity sheet, dated June 22, 1984, documents

that Reverend Poindexter "related in confidence that the deceased may have been a homosexual, and that he in fact had received a complaint about five years ago from the mother of a 17–year-old parishioner that deceased had propositioned the 17–year-old for sex (male)." N.T., 9/25/2012, Exhibit P–24. This report was not revealed to Williams until September 2012 when the police files were ordered to be produced. The witness statement of Reverend Poindexter provided to defense counsel at trial had been "sanitized" to remove all mentions of homosexuality or the police report. *Id.*, Exhibit C–2, Item 19.

The hearing evidence also reflected that Mamie Norwood had reported to police information about Norwood's homosexual involvement with a teenage boy. According to the police activity sheet, Mamie Norwood told police about a strange incident when her husband woke her at 2:00 a.m. to ask for money, and she saw a " 'young male, slim' standing silently in the hallway of her home." *Id.*, Exhibit P–24. Her husband loaded stereo equipment into his car, drove off with the young man, and "returned home around 9–10 a.m. the next day and told her a 'rambling' story of being 'abducted,' " and "pleaded with her not to get the police involved." *Id.* As with Reverend Poindexter, Mamie Norwood's witness statement provided to defense counsel at trial completely omitted this information. *Id.*, Exhibit C–2, Item 17.

Third, Prosecutor Foulkes' own files showed her knowledge that the mother of Ronald House, a 16–year-old boy in Amos Norwood's church, reported to law enforcement officials about Mr. Norwood's pedophilia. N.T., 9/20/2012 (PM), Exhibit Court–2. Prosecutor Foulkes' own notes reflect that she learned that Ronald House had been groped "on privates" by Mr. Norwood, and that there were other "pos-

sible incidents." *Id.* This information was not provided to the defense until September 2012. N.T., 9/25/2012, Exhibit C–2.

Judge Sarmina ruled that Williams' *Brady* claim was timely under the governmental interference exception to the PCRA's time bar. PCRA Court Opinion, 11/27/2012, at 19 & n.40 (citing 42 Pa.C.S. § 9545(b)(1)(i)). She first determined that "[b]y removing direct and indirect evidence which demonstrated that Amos Norwood had homosexual relationships with teenage boys from the statements that were turned over to the defense, the government interfered with" Williams' ability to assert a *Brady* claim. N.T., 9/28/2012, at 16. "It became clear for the first time in September 2012 that the Commonwealth made incomplete disclosures to defense counsel at the time of trial, and that the government's representations to the 1998 PCRA court were, in fact, misrepresentations." PCRA Court Opinion, 11/27/2012, at 18. Next, Judge Sarmina ruled that Williams filed his *Brady* claim within sixty days of the first date on which it could have been filed. *Id.* at 18–19 (citing 42 Pa.C.S. § 9545(b)(2)). Finally, Judge Sarmina concluded that the *Brady* claim had not been waived or previously litigated, as there "was no prior proceeding in which [Williams] could have raised the claim that the government suppressed evidence that Draper had been pressured to call the crime a robbery-gone-wrong, or the claim that the government suppressed evidence of the victim's homosexual ephebophilia, as the latter evidence was uncovered in September 2012." *Id.* at 24. No amount of due diligence could have uncovered the Commonwealth's interference, as (until September 2012) its files were not available to Williams and Draper had consistently refused to cooperate with Williams' attorneys. *Id.* at 19–23.

With respect to the merits of Williams' *Brady* claim, Judge Sarmina determined that the Commonwealth had suppressed multiple pieces of information, including the sanitized witness statements of Mamie Norwood and Reverend Poindexter, the police report regarding Ronald House, and Marc Draper's statements regarding the true motivation for the crime. *Id.* at 25–26, 41. This evidence was favorable to the defense, as it could have been used to cross-examine Mamie Norwood and Reverend Poindexter, and Ronald House could have been called during Williams' case-in-chief in the penalty phase to demonstrate further that Norwood was a homosexual ephebophile. *Id.* at 34–39. This testimony, in turn, could have provided defense counsel with a basis for contradicting Prosecutor Foulkes' closing argument that Norwood was a "nice" and "innocent" man. *Id.* at 38. Moreover,

> [a] reasonable defense attorney would have highlighted how Mr. Norwood's pattern of impropriety was a "circumstance of [this] offense," offering a reason to view [Williams] through a mitigating lens. Having established that there is "some" evidence of a mitigating circumstance, a trial judge "shall" instruct the jury on that mitigating circumstance. 42 Pa. C.S. § 9711(c)(1)(ii). When viewed in combination with the details of the crime, evidence of Mr. Norwood's prior improprieties would cast this offense in an entirely different light; the withheld evidence credits and corroborates [Williams'] own account of having been victimized by Mr. Norwood.

*Id.* at 37.

Finally, Judge Sarmina ruled that the evidence was material and that its suppression was prejudicial to Williams:

> [D]uring the penalty phase, reasonable defense counsel would have re-called Reverend Poindexter, questioning the Re-

verend about the basis of his belief that Mr. Norwood was a homosexual, that Mr. Norwood had used his position at the church to surround himself with adolescent boys ..., and that complaints had been lodged about Norwood's sexual advances on some of those boys. That testimony would have changed at least one juror's view of Mr. Norwood. It would have been natural to second-guess whether Mr. Norwood intended to engage in a sexual act with Mr. Williams on the night of the murder. Viewed through that lens, reasonable defense counsel would also have re-called Mamie Norwood in order to highlight the parallels between the decedent's actions on the night of the killing and the night in which Mr. Norwood brought a "young male, slim" into his home, then drove that person away in his car and did not return until the next morning .... The similarities between the night of the murder and the previous suspicious late-night activity with an adolescent boy supports the argument that Mr. Williams was another one of Norwood's teenage sexual targets. And finally, Mr. Williams would have called Ronald House to testify that when he and Mr. Norwood were alone, Mr. Norwood propositioned him for sex and touched his genitals.

*Id.* at 50–51.

The OISR concludes that Williams' PCRA petition was not timely filed because Williams knew of Norwood's homosexual ephebophilia before 2012, and thus could have presented his claim sooner. OISR at 120. The OISR further contends that Williams "did present this argument at the 1998 PCRA hearing." *Id.* at 120. There are at least two significant problems with these arguments. First, the OISR fails to recognize that Williams' 2012 PCRA petition asserts a *Brady* claim, the

first of its kind in the long procedural history of this case. Because the Commonwealth's suppression of evidence did not come to light until 2012, no *Brady* claim could have been asserted until then, as Williams had no knowledge of the suppression of this information and could not have gained said knowledge through the exercise of due diligence. Second, even if Williams were required to show that he had no knowledge Norwood's homosexual ephebophilia to assert a *Brady* claim under the governmental interference exception, which as a matter of law he is not, the record contains no evidence that Williams had any such knowledge.

The OISR's focus on the facts encompassed within the suppressed evidence (namely, Norwood's homosexual ephebophilia) reflects that it is improperly analyzing timeliness under section 9545(b)(1)(ii), rather than under section 9545(b)(1)(i). Section 9545(b)(ii) provides an exception when the "facts on which the claim is predicated were unknown to the petitioner." 42 Pa.C.S. § 9545(b)(1)(ii). Section 9545(b)(1)(i), in significant contrast, provides an exception when the "failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States." 42 Pa.C.S. § 9545(b)(1)(i). In other words, section 9545(b)(1)(i) provides an exception to the one year time bar when there has been an **unconstitutional interference by government officials**, i.e., a *Brady* claim. This Court has explained that

> a *Brady* violation may fall within the governmental interference exception[. T]he petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the

exercise of due diligence. ... [Section] 9545(b)(1)(ii)'s exception does not contain the same requirements as a *Brady* claim. ...

*Commonwealth v. Abu–Jamal,* 596 Pa. 219, 941 A.2d 1263, 1268 (2008) (citations omitted); *Commonwealth v. Howard,* 567 Pa. 481, 788 A.2d 351, 355 (2002) ("[W]here a petitioner alleges that a District Attorney's failure to produce documents amounts to governmental interference, then that petitioner must identify a specific claim that he was unable to discover or develop due to the District Attorney's conduct."); *Commonwealth v. Breakiron,* 566 Pa. 323, 781 A.2d 94, 98 (2001) ("a properly plead *Brady* claim may fall within the governmental interference exception").

Accordingly, to satisfy the governmental interference exception, the petitioner must demonstrate (1) that interference by governmental officials prevented him from discovering and bringing his *Brady* claim sooner, and (2) that he could not have known of the governmental interference earlier through the exercise of reasonable diligence. *Abu–Jamal,* 941 A.2d at 1268. As detailed herein, Williams satisfied these requirements in this case. *See supra,* pp. 10–11. There is no question that the Commonwealth suppressed the evidence that forms the basis for Williams' *Brady* claim. Moreover, Williams did not know that the Commonwealth had suppressed this evidence until 2012. Williams could not have learned about the suppression of evidence earlier through the exercise of due diligence, as he had no access to the Commonwealth's files until Marc Draper came forward in 2012 with his affidavits, which resulted in the discovery orders that finally revealed the Commonwealth's suppression of evidence.

In addition, Williams had no access to the information that had been suppressed.

The evidence that the Commonwealth withheld was that Amos Norwood had engaged, or may have engaged, in inappropriate sexual behavior with other teenage boys in the past. [Williams] obviously would have known about prior sexual encounters that **he** had with Mr. Norwood. But evidence that Mr. Norwood touched Ronald House's genitals, that Reverend Poindexter had received at least one complaint about a specific instance in which Mr. Norwood was sexually inappropriate with a teenage male, and that Mr. Norwood's wife awoke in the middle of the night as her husband left the house with a "young male, slim" and later related a bizarre story to her, was undoubtedly beyond the scope of [Williams'] conceivable knowledge.

PCRA Court Opinion, 11/27/2012, at 31–32 (emphasis in original).[5]

The OISR's contention that Williams already knew about Norwood's homosexual ephebophilia before 2012, and that he in fact "presented a claim that Norwood was a homosexual ephebophile" in 1998, is not supported by the evidentiary record. The OISR cites to Draper's trial testimony that on the night of the murder, Williams told him that Norwood was a homosexual and that they could use this information to extort money from him. OISR at 120. The OISR also points to Draper's testimony that he taunted Norwood at the scene of the murder by telling him, "oh, you like boys." *Id.* Judge Sarmina found as a matter of fact, however, that this evidence is fundamentally different from the evidence

that the Commonwealth suppressed. Draper's testimony went only to Williams' knowledge of Norwood's sexual **orientation**, not to his proclivity to **molest adolescents**. PCRA Court Opinion, 11/27/2012, at 16 n.34.

The OISR also reviews the expert testimony presented by Williams at the 1998 PCRA evidentiary hearing, but does not identify any testimony by either of the three experts suggesting that Norwood was a homosexual ephebophile. OISR at 120–21. With respect to Dr. Kessel, the OISR notes that Williams told him that he had been sexually molested by a male teacher on several occasions, and that he had feelings of rage towards males who made him feel sexual. *Id.* at 120. The OISR also indicates that Dr. Kessel alluded to sexual relations between Williams and other men, including Herbert Hamilton. *Id.* Finally, the OISR notes that Dr. Kessel testified, "If there was a sexual component to Williams' relationship with Norwood," it would have "substantially contribute[d] to a reduction in his ability to control his impulses around somebody who would make or whom he would interpret to make an advance." *Id.* The OISR fails to note that because all evidence of Norwood's homosexual ephebophilia had been suppressed, the PCRA court immediately advised Dr. Kessel, "Well there wasn't, I don't think." N.T., 4/8/1998, at 159. Contrary to the OISR's suggestion, Dr. Kessel did not testify that Williams ever advised

---

**5.** Responsive to the OISR's various contentions regarding due diligence, *see, e.g.,* OISR at 118 & n.12, the PCRA court found as a matter of fact, and the certified record supports, that prior to 2012, Williams could not have learned through the exercise of due diligence that the Commonwealth had suppressed the exculpatory evidence that forms the basis for the present *Brady* claim. Likewise, the PCRA court found, and the certified

record supports, that Williams had no access to the specific information contained in the suppressed evidence (including the report of the touching of Ronald House's genitals and the sanitized portions of the witness statements of Reverend Poindexter and Norwood's wife), and he could not have discovered this information through the exercise of due diligence.

him that he was aware that Norwood had sexual relationships with other teens.

The OISR also references testimony from two other experts, Drs. Fleming and Kaufman, again suggesting, without any support in the record, that their testimony reflects Williams' knowledge of Norwood's sexual encounters with other teenagers. OISR at 120–21. According to the OISR, Dr. Fleming testified that Williams' decision to burn Norwood's body reflected that it was a crime of rage, and that Williams' threat to expose Norwood's sexual orientation likely contributed to Williams' motive. *Id.* at 120. Likewise, Dr. Kaufman testified that Williams told him he was angry with Norwood after "there was some talk that they were going to be involved in sexual activity," and that it was "implied" that Williams was angry about abuse by Norwood. *Id.* at 120–21. Again, however, neither Dr. Fleming nor Dr. Kaufman testified that Williams knew about by sexual activities between Norwood and other teenage boys.

Finally, the OISR cites to the testimony of James Villarreal[6] and Donald Fisher, but does not mention either the Commonwealth's misrepresentations to the PCRA court in response, the PCRA court's decision to ignore the testimony, or Judge Sarmina's subsequent findings of fact. OISR at 121–22. When Villarreal testified that he had heard from others about Norwood's activities with teenage boys, the PCRA court immediately asked counsel for the Commonwealth if there was any evidence in the record "involving Norwood's homosexuality or violation of young boys." N.T., 4/8/1998, at 237. Counsel for the Commonwealth responded that other than Draper's testimony regarding a possible attempt to extort money from Norwood, there was no such evidence. *Id.* When Fisher offered his testimony about Norwood's relationship with Williams, the PCRA court refused to consider it based upon Fisher's mere assertion with no factual support for its accuracy. *Id.*

In its subsequent written opinion denying Williams' 1998 PCRA petition, the PCRA court not only did not credit the testimony of Villarreal and Fisher, it did not even mention it. As Judge Sarmina found, the reason for this was the Commonwealth's intentional misrepresentation that there was no evidence to support any claims of sexual abuse by Norwood:

> Precisely the evidence that [the PCRA court] asked for was sitting in the government's files. Without that evidence, the Court forcefully attacked the relevance of testimony proffered by the defense as to any sexual impropriety in Norwood's past. Based on the Commonwealth's affirmative representation that there was nothing else in the case involving Norwood's "homosexuality or violation of young boys," [the PCRA court] prevented both lay witnesses and expert witnesses from developing that issue.

PCRA Court Opinion, 11/27/2012, at 16–17.

In sum, Judge Sarmina found, as a matter of fact, that the Commonwealth, both

---

**6.** Surprisingly, the OISR references Villarreal's testimony that he had not been contacted by Williams' defense counsel to testify at trial. OISR at 121. The present PCRA petition includes no claim of ineffectiveness for failing to call particular witnesses at trial.

Notably, however, one could plausibly argue that the Commonwealth's suppression of evidence of Norwood's homosexual ephebophilia negatively affected defense counsel's preparation for trial, since counsel, without any knowledge of Norwood's proclivities towards other adolescents, would have had no reason to interview potential witnesses to obtain additional proof of the same to present at trial. Absent the false impression created by the Commonwealth's suppression of evidence, defense counsel may well have sought out witnesses like Villarreal.

by suppressing the evidence in 1986 and then by misrepresenting the evidence again in 1998, prevented Williams from asserting a *Brady* claim until 2012. *Id.* The OISR has pointed to no evidence in the certified record to contradict this finding of fact. Williams did not assert a *Brady* claim in 1998, as he had no knowledge of the Commonwealth's suppression of evidence at that time. Instead, he asserted his first, and only, *Brady* claim in 2012, when he first learned of the basis for that claim. As a result, his PCRA petition in 2012 asserting a *Brady* claim was timely filed under the governmental interference exception in section 9545(b)(1)(i) of the PCRA.

Because we find that Williams' PCRA petition was timely filed, we next address the merits of his *Brady* claim. Based upon my review, Judge Sarmina's findings with respect to the *Brady* claim are adequately supported by evidence of record. This Court set forth the elements of a *Brady* claim in *Commonwealth v. Willis*, 616 Pa. 48, 46 A.3d 648 (2012):

> [T]his Court has explained that, in order to establish a *Brady* violation, a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *See Commonwealth v. Lambert*, 584 Pa. 461, 471, 884 A.2d 848, 854 (Pa. 2005); *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 577–78 (Pa. 2005). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d

> 872, 887 (Pa. 2002) (citation omitted and emphasis added). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 29, 807 A.2d at 887–88 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3375).

*Id.* at 656; *see also Commonwealth v. Weiss*, 622 Pa. 663, 81 A.3d 767, 783–84 (2013); *Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345, 370–71 (2011).

The first two elements are clearly satisfied in this case. First, as described hereinabove, the Commonwealth willfully suppressed multiple items of evidence, including the sanitized witness statements of Mamie Norwood and Reverend Poindexter and the report about Ronald House. Second, the evidence could have been used to cross-examine Mamie Norwood and Reverend Poindexter and impeach their testimony regarding Norwood's positive work with youth at his church, contending instead that Norwood used his position in the church to identify sexual encounters with teenage boys. Calling Ronald House to testify in Williams' case-in-chief in the penalty phase of trial would have further strengthened this theory and would likewise have provided defense counsel with strong grounds to rebut the Commonwealth's closing argument that Norwood was a "kind" and "innocent" man while Williams was a cold-blooded killer. In this regard, defense counsel could also have compared Williams to Norwood's other victims, thus eliminating the perception that he killed Norwood for a small amount of money and credit cards. *See Simmons v. Beard*, 590 F.3d 223, 238 (3d Cir. 2009) ("Without the evidence sup-

pressed by the prosecution, however, the defense could not credibly proffer such a theory. Had this information been available to the defense before trial, it could have much more effectively attacked the Commonwealth's case... :").

Finally, the OISR contends that Williams made a "strategic decision" to testify that he did not participate in Norwood's murder, rather than to tell the jury about his "own knowledge that Norwood had paid him for homosexual favors and that the two had a history of homosexual relations." OISR at 122–23. As Judge Sarmina properly noted, however, without other examples of Norwood's abuse of teens, Williams' testimony "would have merely seemed like an attempt by [Williams] to sling mud on the victim's character" and would have been incredible to the jury. PCRA Court Opinion, 11/27/2012, at 33. On the other hand, with multiple victims to substantiate Norwood's status as a homosexual ephebophile, defense counsel could potentially have convinced Williams not to take the stand (as he did) and deny that he had ever met Norwood. See Commonwealth v. Carson, 559 Pa. 460, 741 A.2d 686, 689 (1999) ("It is well settled that the decision to testify on one's behalf is ultimately to be made by the defendant after full consultation with counsel."). Instead, defense counsel may have been able to convince Williams to testify at the penalty phase and tell the jury about his prior abuse at Norwood's hands.

With respect to the third element of a *Brady* claim, materiality and prejudice, the Commonwealth's multiple *Brady* violations leave little room for confidence in the jury's decision to sentence Williams to death. In her closing argument at the penalty phase of the trial, Prosecutor Foulkes told the jury:

[Y]ou know the horrible circumstances of the death of Amos Norwood. You know that the defendant, Terrence Williams, for no reason but that a kind man offered him a ride home, that he and another man tied him up in the darkness of a cemetery, and beat him to death, squashed him like a bug that you might be irritated with against the windshield, beat him with two blunt instruments.

N.T., 2/3/1986, at 1873. Prosecutor Foulkes then cast Norwood as a helpless victim unable to protect himself from Williams:

[Williams] has taken two lives, two innocent lives of persons who were older and perhaps unable certainly to defend themselves against the violence that he inflicted upon them. He thought of no one but himself, and he had no reason to commit these crimes.

*Id.* at 1876–77.

With the suppressed evidence in hand, defense counsel could have effectively rebutted these closing arguments by emphasizing, credibly, that Norwood was in fact an abuser of teenage boys, possibly including Williams. In so doing, defense counsel could have argued that Williams feared that Norwood intended to abuse him at the cemetery and that his judgment was thus substantially impaired. So viewed, the jury could have found that these circumstances of the crime were a mitigating factor. 42 Pa.C.S. § 9711(c)(8) (allowing a defendant to introduce "[a]ny other evidence ... concerning ... the circumstances of his offense."). The jury may also have considered this evidence to provide a better explanation for Williams' brutal behavior on the night in question, specifically as a crime of rage against Norwood, a sexual abuser, rather than as a coldly calculated act for nothing more than petty greed. Defense counsel could have portrayed Norwood as a victimizer of both

Williams and others and developed the argument that Norwood's abusive behavior impaired Williams' judgment on the night of the murder. With the evidence of Norwood's homosexual ephebophilia before the jurors, they may well have believed Marc Draper's testimony that Williams "snapped" at the time of the killing, and that this "snapping" was the result of Norwood's prior abusive conduct. PCRA Court Opinion, 11/27/2012, Attachment B (Draper Affidavit, ¶ 8).

Mirroring the OISR's arguments about Williams' "strategic decision" to testify, the Commonwealth insists that the suppressed evidence was contrary to Williams' actual defense at trial. Commonwealth's Brief at 43–48 (citing N.T., 1/27/1986, at 1253). The Commonwealth contends that Williams insisted on testifying, despite defense counsel's advice to the contrary, because he repeatedly demanded a defense that could result in an acquittal. *Id.* In this regard, the Commonwealth further notes that Williams rejected his counsel's advice to accept a pre-trial plea offer of a life sentence in exchange for a guilty plea. *Id.* at 47.

The Commonwealth's arguments rely on two misstatements of applicable law. First, the Commonwealth cites to *United States v. Agur*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), for the proposition that a prosecutor's failure to disclose exculpatory evidence violates a defendant's due process rights only if "the omitted evidence creates a reasonable doubt that did not otherwise exist," and rejecting as inconsistent with *Brady* a standard that would "focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial." Commonwealth's Brief at 36 (citing *Agur*, 427 U.S. at 112 & n.20, 96 S.Ct. 2392). In *Willis*, however, this Court, relying on Supreme Court precedent that post-dates *Agur*, including

*United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), held that nondisclosed information may be material if it affects the defense's preparation for trial. *Willis*, 46 A.3d at 670. Accordingly, in deciding whether suppressed evidence was prejudicial, courts may in fact consider whether disclosure could have resulted in different trial preparation and trial strategy.

Second, the Commonwealth's focus on what Williams **would** have done if the suppressed evidence had been disclosed is also inaccurate. *See* Commonwealth's Brief at 45 n.13 ("the mere possibility that counsel would have advised defendant not to testify is inconsequential absent proof that defendant would have accepted that advice") (citing *Agur*). In *Bagley*, the Supreme Court held that undisclosed evidence is material under *Brady* when, "if disclosed and used effectively, it might make a difference." *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. In *Willis*, this Court interpreted *Bagley* to require prosecutors to produce all evidence that **"could** have been used by the defense to impeach prosecution witnesses." *Willis*, 46 A.3d at 653 (emphasis added). As such, rather than follow the Commonwealth's proposed analysis of attempting to speculate as to what Williams **would** have done if the information had been disclosed, the proper course is to conduct an objective analysis as to what capable defense counsel **could** have done with the suppressed evidence to achieve a contrary result at trial.

In the present case, Judge Sarmina conducted just such an analysis. She concluded that Williams' defense counsel could have cross-examined Mamie Norwood and Reverend Poindexter regarding their knowledge of Norwood's "sexual improprieties," and could have called Ronald House as a witness in the penalty phase to strength an argument to counter the Com-

monwealth's characterization of Norwood as "kind" and "innocent" man during its closing argument. PCRA Court Opinion, 11/27/2012, at 37–39. Focusing on Norwood's sexual improprieties, defense counsel could also have cast the murder in a different light, namely as a mental (or psychotic) "snap" of anger and rage in response to Norwood's abuse of Williams and others, which in turn could have led one or more jurors to find a mitigating circumstance to explain Williams' actions. *Id.* at 50–51.

For these reasons, the September 28, 2011 order of the PCRA court granting a stay of execution and ordering a new penalty phase trial is affirmed. The matter is remanded to the Court of Common Pleas of Philadelphia County for a new penalty phase trial.[7]

Justice Wecht joins this Opinion in Support of Affirmance.

## OPINION IN SUPPORT OF REVERSAL

### JUSTICE MUNDY

Because I believe Williams has not met the governmental interference exception to the PCRA time-bar, I would vacate the PCRA court's order granting Williams a new penalty phase hearing, and would reinstate Williams' sentence of death.

On June 11, 1984, Williams and Marc Draper, both 18 years old at the time, murdered Amos Norwood. The facts presented at trial were summarized by this Court in Williams' direct appeal. *See Commonwealth v. Williams,* 524 Pa. 218, 570 A.2d 75, 77–79 (1990). Briefly, I recount the following pertinent facts from our previous opinion.

Early in the day on June 11, 1984, Williams and Draper were gambling when they ran out of money. Williams devised a plan to travel to Norwood's house to extort money from him. Williams spent 15–20 minutes inside Norwood's home while Draper waited nearby. Williams returned with ten dollars, crossing paths with Norwood's wife, Mamie Norwood, while exiting the house. Williams and Draper left Norwood's house and returned to a gambling game they had been participating in prior to traveling to Norwood's home.

Two or three hours later, Norwood was on his way to church when he passed through an intersection where Williams and Draper were standing. Williams flagged down Norwood, and got into Norwood's car and drove away with him. A few minutes later, the car returned to the intersection and picked up Draper. Before getting into the car, Williams alerted Draper of his plan to give Norwood false directions so they could rob him.

Williams rode in the passenger seat, Draper in the rear seat behind the driver. The pair gave Norwood false directions which led him to a dark secluded area near a cemetery. Draper grabbed Norwood from behind, and Williams ordered him out of the car. Norwood was led into the cemetery and forced to lie face down while Williams and Draper searched him, finding twenty dollars in his sock. While Norwood begged for his life, Williams and Draper tied his hands behind his back with his shirt, tied his legs together with his pants, and stuffed his socks into his mouth. Draper stayed with Norwood while Williams returned to Norwood's car. At that point, Draper had a foot on Norwood's back and was taunting him about liking boys. N.T., 1/22/86, at 813.

Williams retrieved a socket wrench and a tire iron from Norwood's car, and began

7.  Williams' ancillary motions are denied as moot.

repeatedly hitting Norwood in the back of the head with the tire iron. At Williams' prompting, Draper voluntarily began to strike Norwood in the head with the socket wrench. Williams and Draper continued the attack until they believed Norwood was dead. The pair then hid the body behind two tombstones, covering it with loose brush. Williams and Draper disposed of the contents of Norwood's glove compartment in a trash can, and left with Norwood's car. That night, Williams returned to the cemetery, soaked Norwood's body in gasoline, and set it on fire.

The next morning, Williams picked up Draper in Norwood's car and they returned to the cemetery to examine the contents of the glove compartment they had thrown in the trash can. In Norwood's wallet they found a Mastercard and an AT & T telephone card, both in Norwood's name. The pair then picked up Ronald Rucker, and the trio headed to Atlantic City, in Norwood's car. The Mastercard and AT & T card were used in Atlantic City.

Norwood's charred remains were found by a passerby on June 15, 1984. Draper was arrested on July 20, 1984, and after learning of his arrest warrant, Williams turned himself in on July 23, 1984.

Williams testified at trial and denied any participation in the murder of Norwood, or that he knew Norwood. Williams testified to being present in the car when Draper

and an individual named Mike Hopkins[1] attacked Norwood. N.T., 1/27/86, at 1181–82. He testified that he got out of the vehicle and walked away when the attack started. *Id.* at 1183. Williams testified he met up with Draper later in the night and Draper told him they had just robbed Norwood and stolen his car. *Id.* at 1186.

On February 3, 1986, a jury convicted Williams of first-degree murder, criminal conspiracy, and robbery.[2] The penalty phase hearing commenced the same day, and the jury found two aggravating factors: (1) Williams committed the murder while perpetrating a felony, and (2) Williams had a significant history of felony convictions involving the use or threat of violence to the person.[3] The jury considered mitigating evidence but found no mitigating circumstances. On February 4, 1986, the jury returned a sentence of death, and on July 1, 1987, Williams was formally sentenced to death. On February 8, 1990, this Court affirmed Williams' sentence of death. *Williams*, 570 A.2d at 75. Williams did not seek certiorari.

Williams filed his first, timely, PCRA petition on March 24, 1995. A hearing was held on April 7–9, 13, 16–17, 1998. Williams abandoned his earlier claim that he did not know Norwood prior to the date of the murder, and presented several witnesses who testified to a homosexual relationship between Norwood and Williams. On Octo-

---

1.  Williams testified that Michael Hopkins died in 1984. N.T., 1/27/86, at 1225.

2.  18 Pa.C.S. §§ 2502(a), 903, and 3701, respectively.

3.  To support the second factor, the Commonwealth introduced evidence of Williams' conviction for burglarizing the home of Hilda and Donald Dorfman on December 24, 1982. N.T., 2/3/86, at 1821. In said incident, Williams robbed the victims, pointed a gun at Mrs. Dorfman, and fired a gun above the

head of Mr. Dorfman. *Id.* at 1823. No one was injured. Williams was convicted of two counts of robbery, and one count each of burglary, simple assault, unauthorized use of an automobile, and conspiracy. *Id.* at 1821. The Commonwealth also introduced the evidence of Williams' murder of Herbert Hamilton on January 26, 1984. *Id.* at 1827. Hamilton died as a result of 20 stab wounds to the body and injuries to the head from a baseball bat. *Id.* Williams was convicted of third-degree murder, theft by unlawful taking, and possession of an instrument of a crime. *Id.* at 1827–28.

ber 20, 1998, the PCRA court denied Williams' PCRA petition. This Court affirmed. *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505 (2004).

Williams filed two more PCRA petitions, which were dismissed by the PCRA court as untimely on February 18, 2005, and June 1, 2005, respectively. Those orders were each affirmed by this Court on appeal. *Commonwealth v. Williams*, 589 Pa. 355, 909 A.2d 297 (2006) (per curiam); *Commonwealth v. Williams*, 599 Pa. 495, 962 A.2d 609 (2009) (per curiam).

While Williams' third PCRA petition was pending, he filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254, which was denied by the District Court on December 19, 2005. The Third Circuit affirmed, and the United States Supreme Court denied *certiorari*.[4] *Williams v. Beard*, 637 F.3d 195, 238 (3d Cir. 2011), *cert. denied Williams v. Wetzel*, 567 U.S. 952, 133 S.Ct. 65, 183 L.Ed.2d 711 (2012). In its opinion, the Third Circuit reviewed Williams' ineffective assistance of counsel claim and agreed with this Court's conclusion that counsel's failure to present evidence of Williams' psychological issues and years of sexual abuse did not prejudice Williams. *Id.* at 234. It noted the mitigation evidence elicited on collateral review was sympathetic and portrayed "a much more complicated and troubled individual than the one depicted during the trial's penalty phase." *Id.* Nevertheless, the Third Circuit concluded this Court applied the *Strickland* test correctly, and a finding of prejudice was not warranted based on Williams' significant history of violent felony convictions, that this was not his first murder, and the brutal facts of Norwood's murder. *Id.* at 236–37.

On March 9, 2012, Williams filed his fourth, untimely, PCRA petition. The circumstances leading to Williams' fourth petition arose on January 9, 2012, when the Federal Community Defenders Office (FCDO) visited Draper at SCI–Frackville, where he was serving a life sentence for his role in the murder of Norwood.[5] Draper signed an affidavit that day stating he told prosecutors on at least one occasion that Norwood was a homosexual and in a relationship with Williams. Aff. of Draper, 1/9/12, at 4. Draper claimed the prosecution did not want to hear that, and they wanted him to testify that the motive was robbery. *Id.* Draper signed a second affidavit on March 1, 2012, stating that on the night of Norwood's murder, Williams "snapped." Aff. of Draper, 3/1/12, at 7. Nothing in the second affidavit referenced a homosexual relationship between Williams and Norwood. Following the second affidavit, the FCDO filed the aforementioned fourth PCRA petition on March 9, 2012, on Williams' behalf. Therein, Williams asserted, *inter alia*, counsel was ineffective at the penalty phase for failing to put forth evidence to mitigate the Commonwealth's assertion that Williams grew up in a stable loving family,[6] that the Commonwealth suppressed evidence of promises made to witnesses to induce cooperation, and that his sentence of death must be vacated because his prior conviction is also invalid based on the promises made to

---

**4.** The District Court denied Williams' petition but granted a certificate of appealability as to two issues. *Williams*, 637 F.3d at 198. The Third Circuit concluded the issues were without merit and affirmed. *Id.*

**5.** Draper pled guilty to second-degree murder on February 21, 1986.

**6.** At Williams' first PCRA hearing, he asserted a similar argument that counsel was ineffective for failing to present mitigating evidence, namely that Williams was sexually abused as a child and that he and Norwood engaged in a homosexual relationship.

Draper. PCRA Pet., 3/9/12, at 23, 32, 39 and 46.

On September 6, 2012, Williams filed a Motion for Discovery requesting the Commonwealth produce police homicide files and activity sheets from the Herbert Hamilton and Amos Norwood murders, as well as any reports or notes made concerning Draper, Reverend Poindexter, or Norwood's sexual relationship with Williams or any child under the age of 18. Mot. for Discovery, 9/6/12, at 5–6. On September 10, 2012, the PCRA court heard arguments on the pleadings to determine if Williams' PCRA petition warranted an evidentiary hearing. The PCRA court permitted Williams the opportunity to obtain any additional information from Draper by September 13, 2012. Draper signed a third affidavit on September 11, 2012, stating the prosecutors and detectives he met with for trial preparation did not want him to testify about Williams' homosexual relationship with Norwood. Aff. of Draper, 9/11/12, at 7. He stated, "I specifically remember Detectives telling me that information I gave them was not credible. They did not want me to say the case involved a relationship. They wanted me to say it was only a robbery." *Id.* The PCRA court concluded there was enough evidence to warrant an evidentiary hearing, which it scheduled for September 20, 2012.

On September 18, 2012, the PCRA court ordered the Commonwealth to produce the trial files for the Hamilton and Norwood homicides prosecuted against Williams in 1985 and 1986, respectively. On September 22, 2012, the PCRA court ordered the Philadelphia Police Department files produced into discovery.

The PCRA hearing was held on September 20 and 24, 2012. The only two witnesses were Andrea Foulkes, the trial prosecutor in both homicide trials, and Draper, the key witness at both trials. On September 24, 2012, Williams filed a written motion, and on September 25, 2012, Williams made an oral motion to "conform the . . . proof to the evidence submitted at the hearing[.]" N.T., 9/25/12, at 51. The PCRA court granted Williams' motion. On September 28, 2012, Williams filed an Amendment and Supplement to Petition for Post–Conviction Relief asserting claims based on evidence contained in the Commonwealth's files.

That same day, after reviewing Williams' supplemental petition, the PCRA court granted Williams' fourth PCRA petition concluding Williams met the governmental interference exception[7] to the PCRA's timeliness requirement based on the Commonwealth's violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) for failing to turn over documents which would have exposed that Norwood may have been a "homosexual ephebophiliac.[8]" 42 Pa.C.S. § 9545(b)(1)(i); PCRA Ct. Op., 11/27/12, at 12–13. The PCRA court specifically found that "the Commonwealth suppressed multiple pieces of evidence, all of which shared a common feature: each strengthened the inference that Amos Norwood was sexually involved with boys around [Williams]' age at the time of his murder." PCRA Ct. Op., 11/27/12, at 12. The PCRA court found Williams only learned about this claim during the September 2012 evidentiary hearing, and could not have raised it sooner.

---

7. The PCRA court found Williams had not satisfied the newly-discovered evidence exception.

8. " 'Ephebophilia' is the psychological term for the attraction of adults to adolescents. It

derives from the root 'ephebe,' which means 'a young man.' " PCRA Ct. Op., 11/27/12, at 13 n.32 (quoting MERRIAM-WEBSTER, WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 610 (2002)).

*Id.* Relevant to this appeal, the three items of exculpatory evidence the PCRA court found were not discoverable by Williams due to governmental interference are the following.

First, a handwritten note by Then–Assistant District Attorney Foulkes, which was never turned over to the defense, regarding a conversation she had with an unnamed person from which she learned Norwood was accused by a parent of touching her son, R.H., at Norwood's church. *Id.* at 12 n.30. Second, a "sanitized" statement from Mrs. Norwood that stated she awoke one night at 2:00 a.m. to find a young male standing in her home.[9] *Id.* at 12 n.31. She stated Norwood woke her to ask her for money and then left with the male, which led her to believe the incident was a kidnapping. Her husband returned at 9:00 a.m. and asked her not to call the police. Third, a "sanitized" statement of Reverend Poindexter to police indicating that he believed Norwood may have been a homosexual and that a parent had disclosed to him that Norwood had propositioned her 17–year-old son for sexual favors. *Id.*

The PCRA court concluded, "[t]he government's sanitization of Mamie Norwood's and Reverend Charles Poindexter's statements, and flat non-disclosure of information about Amos Norwood's sexual advances on [R.H.], interfered with [Williams] and his attorney learning that Mr. Norwood had engaged in sexually inappropriate behavior with teenage boys other than [Williams]." *Id.* at 15. Thus, the PCRA court concluded the withholding of this evidence resulted in the inability of Williams' attorney to " 'discover or develop' a *Brady* claim rooted in information

removed from the scrubbed statements." *Id.* The PCRA court denied all guilt phase issues, granted a stay of execution, vacated Williams' death sentence, and ordered a new penalty hearing.

On October 3, 2012, the Commonwealth appealed, arguing Williams' PCRA petition was untimely and did not meet the governmental interference exception to the PCRA's timeliness requirements. Alternatively, the Commonwealth argued that if the petition was deemed timely, Williams' *Brady* claim would be meritless as it would not have been reasonably likely to change the outcome, had no apparent exculpatory value, and had been known all along by Williams.

This Court filed an opinion vacating the PCRA court's order and reinstating Williams' sentence of death on December 15, 2014. *Williams*, 105 A.3d at 1236. On June 9, 2016, the United States Supreme Court granted certiorari, vacated this Court's judgment, and remanded the matter on due process grounds.[10] *Williams v. Pennsylvania*, —— U.S. ——, 136 S.Ct. 1899, 195 L.Ed.2d 132 (2016). Thus, the Commonwealth's appeal from the PCRA court's September 28, 2012 order is before this Court a second time.

Our standard of review "is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Busanet*, 618 Pa. 1, 54 A.3d 35, 45 (2012) (citation omitted). A PCRA petition must "be filed within one year of the date the judgment becomes final[.]" 42 Pa.C.S. § 9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme

---

9. The PCRA court found the statements were "sanitized" to remove any reference to Norwood's sexual orientation.

10. The Supreme Court expressed no opinion on the merits analysis of this Court's prior opinion.

Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* § 9545(b)(3). "This timeliness requirement is jurisdictional in nature, and a court may not address the merits of any claim raised unless the petition was timely filed or the petitioner proves that one of the three exceptions to the timeliness requirement applies." *Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016) (citing *Commonwealth v. Jones*, 617 Pa. 587, 54 A.3d 14, 16 (2012)). Further, "a petition raising an exception to the one-year timeliness requirement must 'be filed within sixty days of the date the claim could have been presented' pursuant to 42 Pa.C.S. § 9545(b)(2)[.]" *Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978, 982 (2008).

Instantly, there is no dispute that Williams' petition is untimely, as it was filed more than twenty years after his judgment of sentence became final. Therefore, Williams was required to prove one of the three timeliness exceptions to the PCRA applied.

The three timeliness exceptions to the PCRA are:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii).

The PCRA court found Williams' petition satisfied the "governmental interference" exception.[11] *Id.* § 9545(b)(1)(i); PCRA Ct. Op., 11/27/12, at 14. Williams asserts that he exercised due diligence because Draper was unwilling to speak to anyone before January 9, 2012. Once Draper gave the January 9, 2012 affidavit, Williams met the jurisdiction requirement as his March 9, 2012 PCRA petition was filed within 60 days of Draper's January 9, 2012 affidavit.

In order to successfully plead governmental interference, an appellant must satisfy Section 9545(b)(1)(i) and show that the claim could not have been previously raised based on interference by government officials. "Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials; and the information could not have been obtained earlier with the exercise of due diligence." *Commonwealth v. Abu–Jamal*, 596 Pa. 219, 941 A.2d 1263, 1268 (2008). As the PCRA court correctly notes, "[w]hen a claim of governmental interference is rooted in the Commonwealth's failure to produce exculpatory evidence, [a PCRA petitioner] bears the burden to 'identify a specific claim that he was unable to discover or develop due to the District Attorney's conduct.'" PCRA Ct. Op., 11/27/12, at 14 (citing *Commonwealth v. Howard*, 567 Pa. 481, 788 A.2d 351, 355 (2002) (internal citation omitted)). Therefore, before addressing the merits of Williams' *Brady* claim, it is first necessary

11. The PCRA court expressly found that governmental interference was the only timeliness exception that applied. PCRA Ct. Op., 11/27/12, at 11 n.28.

to determine whether Williams exercised due diligence in presenting the claim that Norwood may have been a homosexual ephebophile.[12]

I note that no one has argued, or attempts to argue, that the governmental interference exception is met by merely asserting that the government withheld evidence. Such a standard would result in granting all PCRA claims of governmental interference when the appellant asserts a violation of *Brady* based on evidence withheld by the government, regardless of whether the substance of the alleged *Brady* evidence was already known to the appellant. The PCRA's timeliness requirement cannot be met by simply asserting a claim that the appellant did not know about the specific piece of evidence withheld by the government. Rather the withheld evidence must contain "information [that] could not have been obtained earlier with the exercise of due diligence." *Abu–Jamal*, 941 A.2d at 1268. Nevertheless, the OISA maintains all that is required is proof that the government withheld information—regardless of the substance of that information. Established law states that "a *Brady* claim may fall within the governmental interference exception[,]" *id.*, but by the dissent's interpretation a *Brady* claim pertaining to withheld evidence will always satisfy the governmental interference exception and bypass the PCRA's time bar.

The Commonwealth argues that not only did Williams fail to exercise due diligence, he "conclusively proved" he already knew of Norwood's "alleged sexual misconduct decades before he filed his untimely fourth

PCRA petition." Commonwealth's Brief at 27. The Commonwealth asserts Williams "was not entitled to circumvent the PCRA's filing deadline by reviving an old allegation against the victim based on new sources of previously-known information." *Id.* at 25.

Specifically, the Commonwealth notes that at trial the evidence demonstrated Williams had personal knowledge of Norwood's sexual orientation, and tried to extort Norwood by threatening to expose it. *Id.* at 29. It argues the evidence demonstrated that Draper taunted Norwood prior to the murder by stating "oh, you like boys." *Id.* Further, the Commonwealth notes that, in a pretrial statement dated July 18, 1984, Ronald Rucker averred Williams had described Norwood to him as a homosexual, stating he "'had been with [Norwood] before' in exchange for money." *Id.* Accordingly, the Commonwealth argues that "a claim that Norwood was homosexual and may have had sexual encounters with male teenagers 'could have been presented' much sooner than [Williams'] fourth PCRA petition in 2012[.]" *Id.*

The Commonwealth argues that Williams "actually did present such a claim at the proceedings on his first PCRA petition in 1998[,]" noting Williams' current attorneys argued to the PCRA court that Norwood "molested young boys." *Id.* (emphasis removed) (citing N.T., 4/8/98, at 235). The Commonwealth points to the 1998 PCRA hearing, where Williams presented several witnesses to testify that he

---

**12.** I disagree with the Opinion in Support of Affirmance (OISA)'s implication that Williams could not have ascertained the information necessary to form his *Brady* claim through the exercise of due diligence. OISA at 107 n.5. The test is not whether he could have discovered the specific evidence withheld, but rather if he could have discovered evidence to support a *Brady* claim that Norwood was a homosexual ephebophile. I maintain that Williams failed to exercise due diligence as illustrated by the evidence presented at the 1998 PCRA hearing.

was a victim of sexual abuse throughout his childhood, and that Williams had a sexual relationship with Norwood.

Williams asserts the PCRA court correctly determined he had proven the governmental interference exception to the PCRA's timeliness requirement. As noted, in addition to the due diligence requirement, the PCRA requires a petitioner to file a PCRA petition within 60 days of discovering a timeliness excepted claim. 42 Pa.C.S. § 9545(b)(2). Williams asserts the triggering date for filing his fourth PCRA petition was the affidavit of Draper signed on January 9, 2012. Williams notes he filed his PCRA petition on March 9, 2012, exactly 60 days from the date of Draper's affidavit, and therefore it was timely.[13]

13. I would be remiss if I failed to note that upon inspection of the certified record, a declaration of Reverend Poindexter from February 9, 2011, disclosed the information upon which the very claims subject to this appeal are based. The declaration stated that he suspected Norwood's death may have been related to his relationship with young men. Dec. of Poindexter, 2/9/11, at ¶ 10. The declaration also states that Mamie Norwood disclosed to him that sometimes young men would show up at their house looking for Norwood, and that Norwood would go missing for periods of time. Id. He further stated that he learned Norwood was spending time at a house or apartment in Center City with gay men. Id. at ¶ 11. Finally, the declaration states that Poindexter was approached by a mother of a 15–year-old boy at St. Luke's who alleged Norwood inappropriately touched her son and other boys at the church. Id. at ¶ 15. Importantly, unlike Draper's declaration, Reverend Poindexter's declaration does not indicate he was unwilling to speak with anyone prior to the date of the declaration.

Williams' March 9, 2012 PCRA petition references the declaration made by Reverend Poindexter in support of his argument that Poindexter "thought for years that Norwood lived a double life as a closeted homosexual; that Norwood's close mentoring relationships with troubled young boys were a source of suspicion and rumors in the church; and that parents of boys involved in youth activities with Norwood complained to Reverend Poindexter about Norwood molesting their sons." PCRA Pet., 3/9/12, at 14. Attached to the PCRA petition is an Appendix containing several witness declarations, including Reverend Poindexter's. Curiously, the table of contents dates the report as February 9, 2012, but the actual document is signed and dated by Reverend Poindexter with the signature "Charles Poindexter, 2/9/11[.]" PCRA Pet. App., 7/16/12, at Tab 10. Reverend Poindexter's declaration includes all three points of evidence at issue now. If the declaration was in fact given on February 9, 2011, Williams only had until April 11, 2011 to file his PCRA petition asserting said claims.

It appears likely that the 2011 date was discovered in preparation of the petition, and is bolstered by the fact that Williams' PCRA petition never cites the date of the Poindexter declaration despite multiple references to it, and instead, repeatedly refers to it as a "recent declaration" or "Poindexter Declaration." See PCRA Pet., 3/9/12, at 14–15, 19, and 33. However, the dates of all other declarations and affidavits are included in the citations to each document.

Williams asserts he met the governmental interference exception as he filed his petition within 60 days of Marc Draper's January 9, 2012 declaration. Id. at 21–22, ns. Any reference to Reverend Poindexter's declaration is omitted from the timeliness discussion. Additionally, Williams never explains why Reverend Poindexter's information was undiscoverable prior to Draper's declaration. Draper's declarations never mention Reverend Poindexter, nor do they assert a basis for Norwood's alleged homosexual ephebophilia. Based on the record evidence of Poindexter's February 9, 2011 signed declaration, and the further lack of explanation regarding the ability to discover Reverend Poindexter's claim prior to Draper's declaration, we could conclude on these bases alone that Williams failed to assert a claim regarding Norwood's alleged homosexual ephebophilia within 60 days of discovering the claim. Nevertheless, there are implications that the interviews with prior witnesses commenced after Draper's first declaration on January 9, 2012. Thus, February 9, 2012 would be a more likely date for Reverend Poindexter's declaration. Accordingly, I do not base my decision on Williams' failure to file a PCRA petition within 60 days of February 9, 2011, the date on Reverend Poindexter's declaration.

Upon review of the certified record and the relevant case law, I conclude that Williams failed to meet his burden under the governmental interference exception to the PCRA's timeliness requirement. The three pieces of evidence the PCRA court concluded violated *Brady* contained allegations of Norwood's alleged sexual orientation and homosexual ephebophilia. Evidence was presented at Williams' 1986 trial, 1998 PCRA hearing, and in his 2005 federal habeas petition claiming these same allegations. I agree with the Commonwealth's assertion that Williams knew of Norwood's alleged homosexual ephebophilia, not just Norwood's sexual orientation, even before the Poindexter and Draper declarations.

At trial in 1986, Draper testified he participated in the murder of Norwood, and he and Williams acted together. N.T., 1/22/86, at 657. On the night of the murder, Williams indicated to Draper that he could obtain money from Norwood by threatening to reveal Norwood's homosexuality to Norwood's wife. *Id.* at 667–68. On cross-examination, Draper testified that when Williams went to the car to get the tire iron and wrench he was standing over Norwood and taunting him by saying "oh, you like boys." *Id.* at 813. Draper stated, he was taunting him because Williams had told him that Norwood was a homosexual. *Id.* Accordingly, at the time of trial, testimony referencing Norwood's alleged homosexual contact with Williams was known by Williams, and Williams was not precluded from presenting a claim regarding Norwood's alleged sexual orientation and proclivity for teenage boys.

In fact, Williams did present this argument at the 1998 PCRA hearing. Williams first presented three experts who evaluated him and concluded his mental state was affected based on a history of physical and sexual abuse and anger regarding his sex-

uality. The defense called Dr. Julie Kessel, an expert in forensic psychiatry who conducted a forensic mental health evaluation of Williams. N.T., 4/8/98, at 40. Williams indicated to her that he was sexually assaulted when he was about 5 or 6 years old by a friend who was 10 or 11. *Id.* at 64. He also reported a relationship with a male teacher who sexually molested him on several occasions. *Id.* Williams told Dr. Kessler this caused him to develop feelings of rage towards males who made him feel sexual or behaved sexually towards him. *Id.* at 66. Williams alluded to sexual relationships with several other men but he was not forthcoming about them. *Id.* at 72. In regard to the Hamilton murder, Dr. Kessel testified there was evidence of a homosexual relationship between Williams and Hamilton. *Id.* at 77. In reviewing the Hamilton file, Dr. Kessler testified there was evidence that suggested Williams was engaged in a homosexual prostitution ring. Further, Dr. Kessel testified that at the time of the Norwood murder, she believes Williams' murder of Hamilton made him less able to appreciate what he was doing to Norwood. *Id.* at 115. Dr. Kessler testified that, if there was a sexual component to Williams' relationship with Norwood, it would have "substantially contribute[d] to a reduction in his ability to control his impulses around somebody who would make or whom he would interpret to make an advance." *Id.* at 159.

Dr. Patricia Fleming, a clinical psychologist, reviewed Williams' file and interviewed him. She testified that the subsequent burning of the body indicated to her this was not just a robbery, but a crime of rage. N.T., 4/9/98, at 361. She testified that Williams and Draper were threatening to expose Norwood's homosexuality, and that it likely contributed to Williams' motive. *Id.*

Dr. Ralph Kaufman, a psychiatrist in private practice conducted three separate clinical interviews of Williams. N.T., 4/13/98, at 519. In his final interview with Dr. Kaufman, Williams admitted to murdering Norwood. *Id.* at 542. Dr. Kaufman testified that Williams implied the motive for murdering Norwood was his anger over being abused by Norwood. *Id.* at 569.

Additionally, despite the PCRA court's assertion that Williams was unable to elicit testimony about Norwood's alleged homosexual ephebophilia at the 1998 PCRA hearing, and that he was "stifled in his presentation of that evidence by the Commonwealth's steadfast representation that there was no such evidence," Williams presented the testimony of several witnesses who testified to their knowledge of Norwood's alleged homosexual ephebophilia. PCRA Ct. Op., 11/27/12, at 21.

James Villarreal, a former teacher, coach, and mentor to Williams, testified that Norwood had a reputation for molesting young boys. N.T., 4/8/98, at 208, 227. He testified to learning this through his employment in the school system, and named a Mrs. Locket and Timothy Collins as sources of his information. *Id.* Villarreal testified he wasn't disputing the evidence of the murder and robbery, but that the motivation may have had a homosexual element. *Id.* at 234. During Villarreal's testimony, the PCRA court asked the defense if they were trying to prove that Amos Norwood molested young boys, to which defense counsel replied "we are trying to, as best we can." [14] *Id.* at 235. Further, the PCRA court asked Villarreal if he was ever contacted by Williams' defense attorney, to which he replied "No." *Id.* at 240. The PCRA Court then asked, "[h]ad you been contacted by [Williams'] defense attorney or by an investigator or by someone else working for the defense attorney you would have spoken to that person freely?" *Id.* Villarreal indicated that he would have spoken freely and given the same testimony. *Id.*

Finally, Donald Fisher, a childhood friend of Williams who was in a sexual relationship with him for four or five years, testified. N.T., 4/13/98, at 596. Fisher indicated there was a sexual relationship between Williams and Draper, and a sexual relationship between Williams and Norwood. *Id.* at 600, 605. Fisher claimed to have knowledge that Williams performed sexual favors for Norwood in exchange for "money and, you know, beer and stuff." *Id.* at 618. He also testified that Norwood "was very degrading and he liked to have

14. The OISA asserts that the Commonwealth falsely represented to the PCRA court that no evidence of Norwood's homosexual ephebophilia existed. However, the exact exchange between the PCRA court and the Commonwealth was as follows.

The Commonwealth: Well, Your Honor, I was only going to remind the Court that, in fact, there was evidence that this defendant knew some sort of dark secret about Mr. Norwood, because this case began as an extortion. He suggested to this co-defendant they knew—that he knew something about Mr. Norwood which would enable them to extort money from Mr. Norwood and Mr. Norwood—

The Court: But there is nothing in this case involving Norwood's homosexuality or violation of young boys—
The Commonwealth: Well, that was the secret.
The Court: —that accrued that was involved
The Commonwealth: Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it. It didn't work so it moved on to robbery and murder, so it was not a secret. It was not a secret to anyone at the time.
The Court: You may proceed.
N.T., 4/8/98, at 237. Contrary to the OISA, the Commonwealth never asserted to the PCRA court that no evidence existed. Rather, the Commonwealth stated no evidence was presented at trial, a fact that is not in dispute.

sex with kids[,]" which the Commonwealth objected to. *Id.* at 602. The PCRA court indicated it was going to allow the testimony to come in to show what was available, but clarified "whether what was available to trial counsel would have been admissible at trial or what impact it would have on trial are matters for argument."[15] *Id.* at 603.

Additionally, in 2005, in its review of the lengthy procedural history of this matter, the Third Circuit noted that the penalty phase was brief, but that at the 1998 PCRA hearing "a very different picture of Williams emerged." *Williams*, 637 F.3d at 229. The Third Circuit recounted the aforementioned evidence of Williams childhood "plagued by frequent physical and sexual abuse[,]" and his involvement in a sexual relationship with Norwood. *Id.*

Accordingly, the three pieces of evidence the PCRA court deemed the Commonwealth withheld, would only have been cumulative of the assertions Williams had already presented, i.e., that Norwood allegedly had homosexual relationships with teenage boys. The first piece of evidence, the handwritten note in the file never specifically mentioned Norwood by name and in vague terms referenced an incident with an individual at church, but stated it was never verified. Second, Mamie Norwood's statement made no indication that she knew of or believed the incident she witnessed was in any way related to her husband's sexual orientation. The statement only indicated that she believed it was a kidnapping. Finally, Reverend Poindexter's statement that Norwood may have been a homosexual was a fact that had been presented several times over the years, and his statement that he had received a complaint alleging an incident occurred with a male corroborated the information Williams already allegedly possessed, that Norwood engaged in homosexual relations with teenage boys. While this information certainly could have been used to portray Norwood in an unfavorable light to the jury, Williams was not precluded from doing so by governmental interference prior to 2012. *See Abu–Jamal*, 941 A.2d at 1269 (noting a PCRA timeliness exception does "not contain the same requirements as a *Brady* claim, . . . the exception merely requires that the facts upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence[ ]") (internal quotations omitted).[16] *See also*

15. The OISA characterizes this exchange as the PCRA court indicating it was not going to consider Fisher's testimony, and somehow also extends this to include Villarreal's testimony. However, the PCRA court merely stated that it could not consider the hearsay as fact. At the outset of Fisher's testimony, the PCRA court stated "I will not rely I don't expect no [sic] Court to rely on hearsay or just conclusions of this witness." N.T., 4/13/98, at 600. The Commonwealth objected to Fisher's testimony regarding Norwood's reputation, to which the Court responded, "Again, I will not consider it as a fact . . . There would have to be evidence of it . . . A statement by any witness of this nature doesn't have much credibility or impact. With that in mind, I'm going to accept it." *Id.* at 602–603. The PCRA court in 1998 accepted the testimony as evidence of what was available to the defense in its preparation of trial. For purposes of our review of Williams' due diligence, this Court is tasked with determining if evidence of Norwood's homosexual ephebophilia was ever presented. The statements of Villarreal and Fisher were as informative as those of Mrs. Norwood and Reverend Poindexter in their implications that Norwood had engaged in sexual acts with teenage boys.

16. *Abu–Jamal* addressed the appellant's reasoning in light of both the newly discovered fact and governmental interference PCRA timeliness exceptions. The Court's focus was on the newly-discovered evidence exception; however, the reasoning necessary to overcome the jurisdictional requirement applies

*Commonwealth v. Morris*, 573 Pa. 157, 822 A.2d 684, 698 (2003) (holding information that was clearly available to [the a]ppellant at the time of trial cannot be cloaked as a claim of governmental interference to circumvent the PCRA timeliness requirements).

Williams made a strategic decision to proceed to trial claiming he did not know Norwood and did not participate in the murder. Williams' decision to pursue an inaccurate factual recitation for the jury prevented him from exposing a motive based on his sexual interactions with Norwood. At a minimum, Williams was in possession of his own knowledge that Norwood had paid him for sexual favors and that the two had a history of homosexual relations. Williams knew of Norwood's proclivity for engaging in sex acts with teenage boys as early as trial, and presented evidence of it throughout the subsequent proceedings. Williams explicitly acknowledged at the 1998 PCRA hearing that he was advancing a claim that Norwood was a homosexual ephebophile. N.T., 4/8/98, at 235. He cannot now claim governmental interference precluded him from discovering this claim regarding Norwood's character until Draper gave his affidavit, when he already asserted the very claim he now raises.[17]

Based on the foregoing analysis, and Williams' previous knowledge of Norwood's alleged homosexual ephebophilia, Williams has failed to meet the governmental interference exception to the PCRA's timeliness requirements.[18] This Court is not to view the evidence in isolation, but rather our task is to determine

if Williams was unable to present his claim based on the government's interference, despite his own due diligence. For all the reasons set forth in this opinion, I cannot hold that the government's interference prevented Williams from presenting evidence of Norwood's alleged homosexual ephebophilia. As a result, the PCRA court was without jurisdiction to consider the merits of Williams' claim and thus, erred in vacating Williams' judgment of sentence and granting him a new penalty phase hearing. Accordingly, the PCRA court's September 28, 2012 order should be vacated, and Williams' sentence of death reinstated.

Justice Dougherty joins the Opinion In Support of Reversal.

---

equally to the governmental interference exception.

**17.** It is unclear why Reverend Poindexter was not interviewed by the defense in preparation for the 1998 hearing as he was a witness at

trial in 1986, who testified about his familiarity with Norwood through St. Luke's Church.

**18.** Because Williams' petition failed to meet the governmental interference exception, I need not reach the merits of his *Brady* claim.